**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

National Football League Management Council, Intervenor.

No. 73–1512.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1974.

Decided Sept. 3, 1974.

Rehearing Denied Nov. 7, 1974.

Matthes, Senior Circuit Judge, concurred and filed opinion.

Edward M. Glennon, Minneapolis, Minn., for petitioner.

John D. Burgoyne, Atty., N.L.R.B., Washington, D. C., for respondent.

Theodore W. Kheel, Battle, Fowler, Lidstone, Jaffin, Pierce & Kheel, New York City, for intervenor.

Before MATTHES, Senior Circuit Judge, HEANEY, Circuit Judge, and SMITH, Senior District Judge.*

HEANEY, Circuit Judge.

The National Football League Player's Association [Union] petitions this Court to review an order of the National Labor Relations Board dismissing a complaint against the Employers, consisting

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

of the National Football League [Owners] and the National Football League Management Council [Council].[1] The complaint alleged that Employers violated § 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by unilaterally establishing a rule that "any player leaving the bench area while a fight is in progress on the field will be fined $200." The Board's decision and order is reported at 203 N.L.R.B. No. 165 (1973).

We emphasize at the outset that the wisdom of the rule is not at issue here. The sole question before us is whether the Board erred in dismissing the complaint on the ground that the rule was adopted and promulgated by the Commissioner of the NFL rather than by the Employers. A brief discussion of the facts is necessary to an understanding of the issue.

On January 22, 1971, the Union was certified by the NLRB as the exclusive bargaining representative for the professional football players employed by the NFL and its member clubs. A collective bargaining agreement was signed by the Union, Council's predecessor (see, n. 1, supra) and each of the member clubs on June 17, 1971, effective February 1, 1970. The Agreement expired on January 31, 1974.

In early 1971, the NFL Commissioner, Pete Rozelle, discussed with his staff the problem of injuries to players through violence on the football field. He directed a member of the NFL staff to discuss this problem with the competition committee (consisting of four Owners or their representatives) to deal with the effect of proposed changes in policy on the competitive aspects of football. The committee recommended that a rule be established to fine players who left the bench during a fight on the field. At the March 25th meeting of the Owners, the Commissioner explained the proposal to the clubs. The Owners then adopted a rule which read:

> Any player leaving the bench area while a fight is in progress on the field will be fined $200.

Rozelle subsequently fined thirty-four players for leaving the bench while a fight was in progress during the Minnesota-San Diego exhibition game on August 4, 1971, fifty-eight players for doing the same thing during the Atlanta-San Francisco game on August 15th, and fourteen players for identical conduct during the Chicago-New Orleans game on October 10th.

On September 30th, the Union's Executive Director, Edward Garvey, wrote to the Commissioner requesting information with respect to the fines imposed as a result of the Minnesota-San Diego incident. On October 18th, Garvey again wrote to the Commissioner. He appealed the imposition of the fines on players who had left the bench during the Minnesota-San Diego and Atlanta-San Francisco games. He did so on the grounds that the players had not been notified of the new rule and that the rule imposing the fines was violative of the Collective Bargaining Agreement, which provided that:

> * * * any change in current practices affecting employment conditions of the players shall be negotiated in good faith.

Commissioner Rozelle replied to the two letters on October 21st. He wrote:

> While still considering your letter of September 30 regarding player fines I am now in receipt of your October 18 letter on the same subject.
>
> *The action taken as the result of the player fights was done so under a resolution passed by the member clubs last March.* It reads:
>
> "Any player leaving the bench area while a fight is in progress on the field will be fined $200."

1. The League consists of twenty-six member clubs. The Council is an unincorporated organization designated by the clubs as their collective bargaining representative, and was formerly known as the National Football League Players Relations Association [NFLPRA]. Hereinafter, the NFLPRA is referred to as the Council.

\* \* \* \* \* \*

It has been the long-standing policy of this office to most certainly accord any disciplined players the right of appeal to the Commissioner, either through writing or hearing, but I have serious doubts whether the [Union] has jurisdiction in the area of player fines for misconduct during the course of a game. Therefore, I believe I must request written argument from the [Union] and the [Council] on this issue before I can entertain any grievance initiated by the [Union]. (Emphasis added.)

The Union responded as follows:

\* \* \* [T]he Collective Bargaining Agreement makes it clear that the [Union] may appeal any grievance that it so desires. Article XII, Section (d) states:

"Any such fine and amount thereof, however, may be made the subject of a grievance in accordance with the provisions of Article X hereof."

Article X relates to the non-injury grievance procedure, and Step 1 states:

"Any NFL player or the [Union] may present a written grievance to any member club or to the League itself within sixty days . . ."

I completely reject any suggestion that we could not have jurisdiction in this matter, given the clear language of the Collective Bargaining Agreement. \* \* \*

It also raised a series of questions going to the merits of the issue.[2]

On December 29, 1971, Garvey wrote to Commissioner Rozelle stating that he was withdrawing the entire matter from the Commissioner's hands and that he was asking the Council to begin negotia-

tions on the matter. He stated that he understood Rozelle's position to be that he was simply implementing a decision of the Owners and that, therefore, the matter was not properly before him.

On February 1, 1972, the Council's Executive Director wrote to Garvey as follows:

We take the position that [the Commissioner] was acting under the powers vested in him as Commissioner under the Collective Bargaining Agreement which incorporates by reference both the NFL Constitution and By-Laws and the Standard Player Contract.

In the absence of language to the contrary, we contend that he has the authority to fine a player and it is reviewable as provided for in the Constitution and By-Laws and the Standard Player Contract. They provide for the right of hearing before the Commissioner.

The Union filed an unfair labor practice charge with the Board on December 10, 1971, alleging that the Employers' unilateral adoption of the rule was a refusal to bargain. Amended charges were filed on February 11 and May 10, 1972. The General Counsel of the N.L.R.B. issued a complaint on May 12, 1972. It alleged that the Employers violated § 8(a)(5) of the Act by unilaterally promulgating and implementing a new rule providing for an automatic $200.00 fine against any player leaving the bench area during a fight or altercation on the football field during the game.

The Employers denied the Union's allegations, taking the position that the fines were Commissioner fines rather than Owner fines and that the Employers had not violated § 8(a)(5) because they had not instituted the rule change.

2. Some of the questions posed by Garvey were:

\* \* \* [D]id the League determine the players who had left the bench while a fight was in progress on the field? If so, how did the League make this determination? Since the ball changed hands in both instances, is a player on the offen-

sive or defensive team who would normally take the field under these circumstances, subject to a fine? Did the League study the films or did the League simply impose the fine on the clubs and ask the clubs to make the determination of who was to be fined and who was not to be fined?

They contended, alternatively, that the action was taken more than six months prior to the filing of the charges by the Union and hence was barred by § 10(b) of the Act, and that the Collective Bargaining Agreement contained grievance and arbitration mechanisms for resolution of the issue and that the Board should stay its hand in deference to those mechanisms.

The administrative law judge found: (1) that the rule was an Owners' fine rather than a Commissioner's fine; (2) that the statute of limitations did not start to run until late August of 1971 when the Executive Director of the Union first learned of the fines and that, therefore, the charges were not barred by § 10(b) of the Act; and (3) that deferral to arbitration was not appropriate because there was no merit to the Employers' position and because the policy considerations underlying the deferral rule would not be satisfied by a procedure where "the arbitrator [Commissioner Rozelle] was determining the merits of his own conduct."

The Employers filed exceptions to the administrative law judge's decision.

The Board agreed that deferral would be inappropriate for the reason that the Commissioner was not a disinterested party and thus the purpose of the Act would not be served by having him resolve the dispute. It went on to state:

As to the merits of the bench-fine issue, the General Counsel and the Union concede that *the Commissioner has, and always has had, the authority to impose fines for conduct detrimental to football with or without the approval of the owners*. This fact leads us to conclude that nothing of substance was changed by the owners' action at their March 25 meeting. *Since it is conceded that the Commissioner had the authority to impose the rule in issue*, and indeed was the moving force in securing an adoption of the rule by the owners, we do not perceive any meaningful or substantial unilateral conduct arising out of the meeting of the owners. Thus, if the

owners had not met on March 25 and the Commissioner had levied the fines without prior consultation, there would be no dispute as to the propriety of his conduct. What the General Counsel and Charging Party are asking us to find is that by approving the resolution, the Respondent unilaterally altered the terms and conditions of employment. We believe any such holding would exalt form over substance, in that mere approval of a rule initiated by the Commissioner adds nothing of substance when the facts show that such approval was neither required nor that it partook of any substantive difference over what the Commissioner could have done without such approval. We therefore find that Respondent's conduct on March 25 did not constitute a violation of Section 8(a)(5) and (1) and we shall accordingly dismiss that portion of the complaint. (Emphasis added.)

We understand the Board to have made the following findings: (1) that the Union conceded that the Commissioner had a right to adopt the bench-fine rule; (2) that the bench-fine rule had in fact been promulgated by the Commissioner rather than the Owners and that the Owners engaged in no meaningful or substantial conduct with respect to its adoption or promulgation; and (3) that, as a matter of law, there is no substantive difference between the Commissioner's imposing individual fines for conduct detrimental to the game after notice and hearing and promulgating the bench-fine rule—thus, promulgation of the rule was within the authority of the Commissioner.

■ (1) The record does not support the Board's finding that the Union conceded that the Commissioner had the right under the Collective Bargaining Agreement to adopt and promulgate the bench-fine rule; to the contrary, the Union denied that he had such a right. The Union agreed only that the Commissioner had a right pursuant to the Agreement to fine a player for conduct detrimental to the League or profession-

al football after *notice* and *hearing.* The distinction is a meaningful one to the Union and also to us.[3] If the Commissioner's power is limited in the manner the Union suggests, each player who has been notified that he is being charged with conduct detrimental to the game can at the hearing attempt to prove that the conduct in question is not, in fact, detrimental and to prove that he did not engage in the proscribed conduct. The questions raised in footnote 2, for example, would have to be answered by the Commissioner.

(2) Nor does the record support the Board's finding that the bench rule was adopted by the Commissioner without meaningful or substantial conduct on the part of the Owners.

(a) The Commissioner stated in his letter of October 21, 1971, that the action was taken pursuant to a resolution passed by the member clubs. He was not called by the Employers to qualify that statement. Thus, it is fair to say that the Commissioner viewed the rule as one adopted and promulgated by the Owners and the individual fines as being levied pursuant to that rule.

(b) The Commissioner did discuss with his staff "his feeling that from now on if a player left the bench area during a fight, he felt he would have to fine him." But, he was obviously concerned about the reaction of the Owners to such a course of action and instead of announcing that such would be his policy or simply imposing a fine when an occasion occurred, he asked a member of the staff of the NFL to discuss the matter with the competition committee of the League—a committee in which only management is represented. When that committee indicated its approval, the Commissioner still wasn't satisfied. He had the committee bring a recommended

---

3. It is not necessary for us to decide this issue in this proceeding; suffice it to say that the Union's position is not without merit. Section 8.13(A) of the By-Laws of the League provide:

> Whenever the Commissioner, *after notice and hearing*, decides that * * * any player * * * has been or is guilty of conduct detrimental to * * * professional football, then the Commissioner shall have complete authority to:
>
> (1) Suspend and/or fine such person in an amount not in excess of five thousand dollars ($5,000) * * *

Section II of the Standard Player Contract for the National Football League provides:

> Player acknowledges the right and power of the Commissioner * * * to fine and suspend * * * any player * * * who is guilty of any conduct detrimental to the welfare of the League or of professional football. * * *

Article II, Section 2, of the Collective Bargaining Agreement provides:

> The provisions of this Agreement * * * supersede any conflicting provisions now existing or which shall exist during the life of this Agreement in the NFL Constitution and Bylaws, the Standard Player Contract, * * * and any other document affecting the wages, hours, or working conditions of NFL players.

Article III, Section 1, of the Agreement provides:

> * * * The Standard Player Contract shall govern the relationship between the clubs and the players, except that this Agreement shall govern if any terms of the Standard Player Contract conflict with the terms of this Agreement. * * *

Article II, Section 3, of the Agreement provides that "disputes over the meaning, interpretation or proper application of the terms of this Agreement" will be determined by unanimous decisions of a joint committee on contract interpretation, and Article X provides that non-injury grievances will be resolved by a two-step grievance procedure culminating in submission to the Commissioner.

An addendum to the Agreement states that any changes in current practices affecting employment conditions of the players shall be negotiated in good faith.

It seems clear from the above that whether the Commissioner is an agent of the Employers, the joint agent of the Union and the Employers, or an independent third party, he has no authority to make changes in practices which affect employment conditions of the players. It also seems clear that when he acts in the capacity of an arbiter, he must act in an impartial manner within the authority given to him by the Collective Bargaining Agreement, and that he must decide matters presented to him on the basis of the evidence submitted by the parties.

resolution to the Owners for their approval. It was only when Owners voted twenty-four to two that the rule should be put into effect that the commissioner had a press release sent out indicating that the bench-fine rule was now in effect.

(c) At no time prior to the press release did the Commissioner discuss the problem of players leaving the bench during fights with the Union. If, as the Employers contend, the Commissioner is the agent of both the Employers and the Union, and promulgated the rule as their agent, one must assume a serious breach of ethics by the Commissioner if he talked to only one of his principals. And, no one suggests that the Commissioner is an unethical man.

To summarize, every fact and inference supports the administrative law judge's conclusion that the rule was adopted and promulgated by the Owners.

■ (3) Finally, the Board held that because the Commissioner had the power to promulgate the bench-fine rule, he exercised that power. The premise is doubtful, *see*, n. 3, *supra*, and the conclusion a *non sequitur*. While the Board is permitted to draw inferences from the facts in the record and while we are required to accept such inferences when supported by facts, we are not required to adopt inferences or conclusions that are totally lacking in factual support.

■ We hold that the Employers, by unilaterally promulgating and implementing a rule providing for an automatic fine to be levied against any player who leaves the bench area while a fight or an altercation is in progress on the football field, have engaged in unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act.

We remand to the Board with instructions to it to adopt a remedy consistent with this opinion.

MATTHES, Senior Circuit Judge (concurring):

In declining to adopt the Administrative Judge's findings that the owners had "instituted the bench-fine rule unilaterally," the Board focused upon the authority of the Commissioner "to impose fines for conduct detrimental to football with or without the consent of the owners." From this premise, the Board reasoned that

[t]his fact leads us to conclude that nothing of substance was changed by the owners' action at their March 25 meeting * * *. Thus, if the owners had not met on March 25 and the Commissioner had levied the fines without prior consultation, there would be no dispute as to the propriety of his conduct. What the General Counsel and Charging Party are asking us to find is that by approving the resolution, the Respondent unilaterally altered the terms and conditions of employment. We believe any such holding would exalt form over substance, in that mere approval of a rule initiated by the Commissioner adds nothing of substance when the facts show that such approval was neither required nor that it partook of any substantive difference over what the Commissioner could have done without such approval.

I am bothered because the Commissioner departed from his apparent normal course followed in imposing fines "without the consent of the owners."

A considered analysis of the whole record convinces me that the Commissioner was concerned, and properly so, over the increasing possibility of unnecessary injury to players, and perhaps spectators, as a result of fights on the field. In his expertise, the Commissioner concluded an automatic fine should be imposed upon all players leaving the bench during an altercation on the field. And according to the position now assumed by the Commissioner and the Board, the Commissioner was fully authorized under the Constitution to take just such action. But apparently the Commissioner was also concerned about the impact such action would have upon the competitive aspects of the game; thus, he was motivated to refer the

problem to his Competition Committee and then to the owners, pursuant to the requirements of the League Constitution.

The Committee pursued its task, contacted the owners, and the subject rule was submitted at the March 25 meeting of the owners. The full minutes of that meeting are not before us. The scanty record reads in pertinent part:

Any player leaving the bench area while a fight is in progress on the field will be fined $200.

Approved by a vote of 24 Yes, 2 No.

Thus, it is readily apparent that the rule was adopted by 24 of the 26 owners, and we can assume they acted responsibly only after full consideration of the proposal.

This did not end the matter. In his letter of October 21, 1971, the Commissioner seized upon the action of the owners at the March 25 meeting by informing Edward R. Garvey, the Executive Director of the NFL Players Association, as follows:

Dear Ed:

While still considering your letter of September 30 regarding player fines I am now in receipt of your October 18 letter on the same subject.

The action taken as the result of the player fights was done so under a resolution passed by the member clubs last March. It reads:

"Any player leaving the bench area while a fight is in progress on the field will be fined $200."

This record leaves me with the firm impression that the actions of the owners and the Commissioner in the consideration and adoption of the subject rule belies the Board's belated conclusion that the owners' participation in causing the rule to be adopted constituted nothing more than idle and meaningless conduct. Rather, the inference is inescapable that the Commissioner and the owners themselves considered the manner of promulgating the rule to be highly significant. Perhaps Commissioner Rozelle sought to insulate himself from the expected criticism of the players by ascribing responsibility for the rule to the owners. Or the Commissioner and owners may have believed that enactment of the rule by the owners would lend greater weight to the Commissioner's action when he sought to enforce the rule against offending players. In any event, the conduct of the owners and the statements of the Commissioner seem at variance with the Board's characterization of the vote by the owners as meaningless.

In the final analysis, this, like many labor cases, involves important fact questions and it is our responsibility as the reviewing court to determine if the Board's findings and decision are supported by substantial evidence on the record considered as a whole. I am not convinced that this test has been met.

I therefore agree that the action should be remanded for an appropriate remedy.